J-S29016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| F.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.F. | : | |
| | : | |
| Appellant | : | No. 591 EDA 2019 |

Appeal from the Order Entered February 4, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  0C1701579

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY LAZARUS, J.:                **FILED JUNE 24, 2019**

B.F. (Mother) appeals from the order, entered in the Court of Common Pleas of Philadelphia County, awarding F.S., paternal grandfather (Grandfather),[1] partial physical custody of her son, J.S. (Child).  After careful review, we affirm the order based on the opinion authored by the Honorable Doris A. Pechkurow.

Mother and her husband, J.S. (Father), are the parents of J.S., who was born in January of 2017.  At the time of J.S.'s birth, Father was suffering from cancer. During Father's illness, Grandfather and his wife, Myrna,[2] cared for Child approximately two days a week so that Mother could visit Father in the

---

[1] Maternal grandparents are both deceased.  **See** Master's Hearing, 5/22/18, at 105.

[2] Myrna testified that she has known Mother for sixteen years and they had a "very close relationship."  N.T. Master's Hearing, **supra** at 177-186.

hospital. When Child was three months old, Father passed away. Two months later, in June of 2017, Mother returned to work. Grandfather and his wife cared for Child in their home for two full workdays each week; they also cared for Child when Mother went running on Saturday mornings. N.T. Master's Hearing, 5/22/18, at 51-52. Mother's home and Grandfather's home are less than two miles apart.

Grandfather and his wife followed this childcare schedule until July 4, 2017, when Mother became upset with Grandfather at a family barbeque. At the barbeque, Grandfather was holding Child, had his finger in Child's mouth, and commented that Child must like watermelon because Grandfather had watermelon juice on his hands. *Id.* at 74-76. Mother testified that, while at the barbeque, Grandfather gave Child, who was five months old at the time, a potato chip. *Id.* at 120.

Mother did not drop off Child with Grandfather at her next scheduled work day after the barbeque, and she did not return Grandfather's calls or text messages. *Id.* at 52. On July 22, 2017, Mother agreed to meet with Grandfather and his wife at a diner. While there, despite Grandfather's inquires, Mother did not explain severing Child's ties with Grandfather other than referencing the Fourth of July barbeque incident. *Id.* at 54-55.

For the next three months, Mother allowed Grandfather to see Child on three brief occasions. *Id.* at 57-61. Mother refused to talk about the reasons she was severing the relationship or to commit to any future contact between

Child and Grandfather. *Id.* On November 15, 2017, Grandfather filed a complaint seeking partial custody.

At the master's hearing on May 22, 2018, both Grandfather and Mother were represented by counsel. Both parties testified. Grandfather's wife, Myrna, also testified.

Mother testified that Child was in daycare five days a week and that she believed this was good for Child's development. *Id.* at 114. Grandfather testified that he and his wife should care for the Child two days a week; he did agree, however, that Mother's choices were to be respected. *Id.* at 100-103. Grandfather stated that he recognizes his daughter-in law is "the mother of [Child] and I only want to be part of it. I think it's in [Child's] best interest to have as much family as possible." *Id.* at 104.

Mother testified that she felt she no longer had a relationship with Grandfather, stating, "[h]e broke my trust." *Id.* at 132. Mother explained that Grandfather "did these things on this particular day, against my wishes and against what I feel is his better safety." *Id.* She did acknowledge, however, that besides those instances at the barbeque, Grandfather had never overridden her decision. *Id.* at 132-33.

Following the hearing, the master found that prior to Father's death, the parties had a good relationship, but after Father's death, the dynamic changed. Specifically, the master found:

> Mother has become wary of [Grandfather] and [his wife] overly asserting themselves. Many of Mother's concerns were unsubstantiated, but nonetheless, the dynamic is not healthy and

there was evidence tending to show that some of her concerns were legitimate (daycare issue). Of note is that Mother is not wary of other members of the paternal side of the family.

Master's Proposed Findings and Order, 6/1/18, at 2.

The master recommended that Grandfather's complaint for custody be denied. *Id.* Grandfather filed exceptions. The trial court entered an interim order granting Grandfather's exceptions and directing the parties to submit proposed partial custody schedules for Grandfather; the order also contained an interim partial custody schedule. Mother filed a motion for reconsideration, which the court denied. Mother then filed a notice of appeal from the interim order, which this Court quashed. *See* Order, 12/18/18. Thereafter, Mother served a notice of relocation on Grandfather; Grandfather filed a counter affidavit and objection, which the court denied without a hearing. The trial court directed Mother to provide the court with details regarding the relocation, noting Mother had not done so, notwithstanding the fact that the court was in the process of rendering a final custody order. *See* Trial Court

Opinion, 3/20/19, at 2 n.1. The court ultimately entered a final custody order on February 4, 2019,[3] granting Grandfather partial custody.[4]

Mother filed a timely notice of appeal. Both Mother and the trial court have complied with Pa.R.A.P. 1925. Mother raises three issues for our review:

1. Whether the trial court erred and/or abused its discretion by depriving Mother of the opportunity to provide evidence and witnesses in this custody dispute when the trial court relied solely upon the custody master's report and findings that were in direct conflict with the judge's final order?

2. Whether the trial court erred and/or abused its discretion in granting Grandfather's exceptions to the custody master's report without due regard to the custody factors set forth in 23 Pa.C.S.A. § 5328(c)(1)?

3. Whether the trial court erred and/or abused its discretion in granting Grandfather's exceptions to the custody master's

---

[3] The order grants Grandfather partial physical custody every Wednesday from 10:00 a.m. to 7:00 p.m., with Grandfather providing transportation from daycare in the morning and to Mother's home in the evening. The order increases Grandfather's time gradually, to a once-a-month overnight (Friday to Saturday), in place of the previous Wednesday schedule. The order also grants custody to Grandfather on Father's Day, from 10:00 a.m. to 5:00 p.m., and grants extended time to Grandfather in the summer, including long weekends that were mutually agreeable as well as one-week periods for the summers of 2020 and 2021. *See* Order, 2/4/19.

[4] The court noted that it "took the relocation information into consideration when fashioning Grandfather's partial custody order and did not provide for any additional hearing because Mother's proposed relocation did not preclude entry of an order similar to one which would have been entered absent the relocation." Trial Court Opinion, supra at 2 n.1. The court also noted that Mother's relocation from Philadelphia to Glenside (a difference of approximately 18 miles and a one-hour drive), did not significantly impair Grandfather's ability to exercise partial custodial rights; hence, the court found the section 5337 relocation factors were not applicable. *See* 23 Pa.C.S.A. § 5337.

report without due regard to the factors set forth in 23 Pa.C.S.A. § 5328?

Appellant's Brief, at 4.

In custody cases, our scope and standard of review are as follows:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting

*Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)).

When deciding an award of custody, the court must conduct a thorough

analysis of the best interests of the child based on the factors set forth in the

Child Custody Act, 23 Pa.C.S.A. § 5328(a),[5] as well as the specific factors

---

[5] **§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a

- 6 -

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

pertaining to grandparent custody, 23 Pa.C.S.A. § 5328(c).[6] ***See E.D. v. M.P.***, 33 A.3d 73 (Pa. Super. 2011); ***see also K.T. v. L.S.***, 118 A.3d 1136 (Pa. Super. 2015).

First, we point out that, contrary to Mother's claims in issues two and three, the trial court considered each of the enumerated statutory factors in sections 5328(a) and (c), and based its decision on those considerations. ***See*** Trial Court Opinion, 3/20/19, at 6; Order and Summary Opinion, 2/4/19, at 3-6. ***See also M.J.M. v. M.L.G.***, 63 A.3d 331, 336 (Pa. Super. 2013). Judge Pechkurow, in a thoughtful and comprehensive opinion, acknowledged that

---

> (14) The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

[6] **(c) Grandparents and great-grandparents.**—

> (1) In ordering partial physical custody or supervised physical custody to a party who has standing under section 5325(1) or (2) (relating to standing for partial physical custody and supervised physical custody), the court shall consider the following:
>
> > (i) the amount of personal contact between the child and the party prior to the filing of the action;
> >
> > (ii) whether the award interferes with any parent-child relationship; and
> >
> > (iii) whether the award is in the best interest of the child.

23 Pa.C.S.A. § 5328(c)(1).

[t]he facts of this case are particularly poignant considering that Mother lost her husband and Grandfather lost his son [three] months after [C]hild was born. Both parties would have been dealing with such a tragic loss as well as the confounding joy of the birth of [C]hild, and the challenge of reconciling such conflicting emotions. It must be noted that, particularly since there are no maternal grandparents, this child has what many, many children do not have - a loving grandparent who is capable of, and wants to be part of [C]hild's life and even provide childcare when needed by Mother. To deny Grandfather contact with [C]hild and to deny [C]hild the love of a grandfather because Mother "lost trust" in Grandfather after the incident on the 4th of July or because Grandfather expressed an opinion that the six-month-old [C]hild would be better with Grandfather for two days out of the work week rather than in full[-]time daycare, is both unreasonable and contrary to Pennsylvania law.

Trial Court Opinion, 3/20/19, at 17.

Secondly, we have reviewed the hearing testimony, and we agree with the trial court's determination that the master's recommendation is unsupported. Indeed, the master specifically states that "[m]any of [M]other's concerns were unsubstantiated [.]" Master's Recommendation, 6/1/18, at 2. Mother's own attorney acknowledged that "[m]any of [Mother's] concerns may have been unsubstantiated[.]" *See* N.T. Exceptions Hearing, 10/9/18, at 38. The master found Mother's concerns with respect to Grandfather's view on the daycare issue legitimate, but, notably, stated that Grandfather "did scale this back." *Id.* The daycare issue, however, was not the precipitating event here; Mother acknowledged her mistrust of Grandfather was based solely on the "July 4th incident." *See* Master's Hearing, *supra* at 132-33; Trial Court Opinion, *supra* at 9. Furthermore, Mother's argument that she was precluded from offering additional testimony

- 9 -

from paternal aunt, Grandfather's daughter, is meritless for this same reason. Because Mother acknowledged that her mistrust of Grandfather was based solely on the July 4th incident, the master concluded that this additional testimony would be cumulative.

Finally, and most persuasively, the trial court considered the fact that "Grandfather is the closest link to his father that [C]hild can hold onto." Trial Court Opinion, *supra* at 6. The court acknowledged Pennsylvania's strong public policy "favoring grandparent involvement in a child's life." *See* Trial Court Opinion, *supra* at 17, *citing* **K.T. v. L.S.**, 118 A.3d at 1164. *See also* **Hiller v. Fausey**, 904 A.2d 875, 886 (Pa. 2006) ("[W]e refuse to close our minds to the possibility that in some instances a court may overturn even the decision of a fit parent to exclude a grandparent from a grandchild's life, especially where the grandparent's child is deceased and the grandparent relationship is longstanding and significant to the grandchild."); **Commonwealth ex rel. Goodman v. Dratch**, 159 A.2d 70, 71 (Pa. Super. 1960) (stating: "Unless there [is] some compelling reason, we do not believe that a grandchild should be denied visitation to his grandparents."). In **Commonwealth ex rel. Williams v. Miller**, 385 A.2d 992 (Pa. Super. 1978), we stated:

> Except under unusual circumstances, no child should be cut off entirely from one side of [his or her] family. [V]isits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. If animosities continue between the parties, and result in adverse [e]ffects on [the child] . . . , a

- 10 -

visitation order may be revised, even to the extent of retracting visitation.

*Id.* at 995 (internal citations omitted) (reversing trial court order denying maternal grandmother visitation with grandchild following mother's death; father's "mistrust" of maternal grandmother was not valid reason for denying grandmother visitation; and if enforcing visitation away from child's home presents harmful effects on child, then trial court may specify place and conditions of visitation).

Here, the trial court recognized that "**[a]bsent egregious circumstances, which are not present here, a child should not be deprived of the unconditional love and devotion that only a grandparent can bestow**." Summary Opinion, 10/22/18, at 5 (emphasis added). Furthermore, the court noted that since Grandfather is the only grandparent involved in Child's life, it is in Child's best interest to receive the emotional benefits provided by this familial relationship. Order and Summary Opinion, 2/4/19, at 4. We agree.

It is troubling that after an exhaustive review of the record, we are unable to discern any basis for the master's recommendation, and even more unsettling, a basis for Mother's concerns. We are acutely aware of a mother's protective instincts, but the record before us provides no support for a finding that Child's safety or welfare would be at risk, or that time with Grandfather would interfere with the mother-child relationship. Severing Child's relationship with Grandfather in essence severs Child's connection to a father

he never had the opportunity to know. Clearly, that is not in Child's best interest.

We have carefully reviewed the record and the parties' arguments, guided by these standards and well-established principles. After our review, we find no abuse of discretion. We affirm the court's order based on the Judge Pechkurow's comprehensive opinion, dated March 20, 2019, which incorporates the court's October 22, 2018 Summary Opinion as well as its February 4, 2019 Order and Summary Opinion.[7] The parties are directed to attach a copy of these three opinions in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/24/19

---

[7] In her Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, Mother raised 17 claims of error. On appeal, she brought forth three issues, which are addressed in the trial court's opinion on pages 6-12.

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
DOMESTIC RELATIONS DIVISION

FILED
2019 MAR 20

| | | |
|---|---|---|
| BROOKE FREEZEMAN | : | |
| Appellant | : | |
| | : | |
| VS. | : | CUSTODY NO. 0C1701579 |
| | : | |
| FREDRICK SNYDER | : | |
| Appellee | : | 591 EDA 2019 |
| | : | |
| | : | |

BY:   DORIS A. PECHKUROW, J.

## OPINION

Mother Brooke Freezman ("Mother") appeals from the order entered February 4, 2019 concerning the child Jackson Snyder, born January 27, 2017, pursuant to which Paternal Grandfather Frederick Snyder ("Grandfather") was awarded periods of partial physical custody with the child.

Procedural Background

Paternal Grandfather Fredrick Snyder, together with Paternal Step-Grandmother Myra Butkovitz, filed a complaint for custody on November 15, 2017. Mother filed Preliminary Objections to same, challenging the standing of Paternal Step-Grandmother, who was married to Paternal Grandfather. Said Objections were granted by order dated March 28, 2018, and Step-Grandmother was removed as a party to the case.

A record hearing was then held before a custody master on May 22, 2018, and a proposed custody order was submitted on June 1, 2018. Paternal Grandfather filed Exceptions and a hearing on the Exceptions was held October 12, 2018, after which the matter

was held under advisement so the court could review the transcript from the hearing before the Master.

An interim order and Summary Opinion in support of same were entered on October 22, 2018, granting Grandfather's Exceptions and directing that the parties submit proposed schedules for partial custody for Paternal Grandfather by November 16, 2018. The interim order also contained an interim partial custody schedule for Grandfather.

Mother filed a Motion for Reconsideration on October 30, 2018, which was denied on October 31, 2018.

On November 14, 2018, Mother filed a Notice of Appeal from the Interim Order, which was quashed by the Superior Court on December 18, 2018.

After filing her Notice of Appeal, Mother served a Notice of Relocation on Grandfather, to which he filed a Counter Affidavit and Objection on November 29, 2018.[1]

On January 10, 2019, this court entered an order directing that Mother amend her proposed custody schedule submitted to the court as directed on October 22nd, which contained no information about her relocation outside of Philadelphia. Mother then submitted a second proposed custody schedule on January 25, 2019.

On February 4, 2019, a final order was issued with a discussion of the factors under 23 Pa. C.S.A. §5328(c)(1), concerning an award of partial physical custody to a grandparent, as well as a discussion of the applicable factors under §5328(a).

---

[1] A custody master conferenced the Objection to Relocation, then took no further action because of the appeal and the pending disposition before this court. No hearing was scheduled by this court on the issue and Mother was directed to provide information to this court concerning the details of her relocation, of which she had never advised this court, notwithstanding the fact that this court was in the process of rendering a final custody order. This court then took the relocation information into consideration when fashioning Grandfather's partial custody order and did not provide for any additional hearing because Mother's proposed relocation did not preclude entry of an order similar to one which would have been entered absent the relocation.

On February 26, 2019 Mother filed the Notice of Appeal from the February 4, 2019 Order as well as a Motion for Special Relief requesting a stay of the order pending appeal.

On March 6, 2019, Paternal Grandfather filed a Petition for Contempt alleging that Mother has failed to produce the child for any period of partial custody since the order was entered. Said Petition has not yet been scheduled for a hearing.

On March 7, 2019, Mother's Motion for Special Relief to stay the order pending appeal was denied without a hearing.

Factual Background

The testimony before the Master was that the child was born January 27, 2017 and Father passed away on May 9, 2017, after suffering from an illness.

Grandfather testified that he and his wife lived close to Mother and Father and saw them approximately every two weeks and helped them paint the nursery. Notes of Testimony, May 22, 2018, pp. 32, 35. Mother made a small photo album for Grandfather for Father's Day in 2017, with photos of Grandfather and his two children (paternal aunt and uncle) as well as Grandfather and Father. Id. at 34-35.

Grandfather saw the child almost daily after the child's birth because he would watch the child when Mother went to the hospital to see Father and when Father was released to a rehabilitation facility, Grandfather continued to see the child regularly, at the rehabilitation facility or when providing childcare for Mother when she went running or at other times as needed. Id. at 41, 50. Once Mother returned to work in June, 2017, Grandfather and Step-Grandmother provided child care two days per week and the other three days the child was in daycare. Id. at 51.

After July 4th, there was no contact with Mother, until the parties met for dinner on July 22nd, when Mother said she needed more time. Id. at 54-56. Mother visited with the

3

child on August 13th, but no arrangements were made for further contact and the communications were stiff. Id. at 57-58. The situation remained the same when Mother came to the beach for a visit with a friend of Grandfather's and at the end of September when Grandfather visited Mother. During these visits, Mother held the child the entire time, rather than allowing contact between Grandfather and the child. Id. at 58-61.

The last time Grandfather saw the child was October 2, 2017, when he and Step-Grandmother were invited to dinner at the home of Maternal Aunt. Id. at 64. Grandfather wrote a note to Mother on November 4th, heard no response, then filed the Complaint for Custody on November 15th. Id. at 65-67.

Grandfather testified he believed the child would be better off with him two days a week (as opposed to daycare fulltime). Id. at 101. When questioned further by the Master, Grandfather said he would defer to Mother's judgment regarding daycare and he would be flexible about seeing the child at other times. Id. at 103. He further stated that he recognizes that Mother is the mother of the child and he only wants to be part of it. Id. at 104.

Mother testified that the child had been enrolled in daycare three days per week until September, when fulltime care was available, and that she had not planned sufficiently in advance when she returned to work on June 20th to enroll the child fulltime. Id. at 109. She down-played her relationship with Grandfather, saying it was purely based upon Father's wanting to spend time with Grandfather and that she was uncomfortable with him. Id. at 112. Her reason for not feeling comfortable with Grandfather was that she met him a few years after first meeting Father. Id. at 113.

She said she only saw Grandfather occasionally after Father died, that Grandfather watched the child when she went running on Saturdays, but she stopped that when she went

4

back to work because she could not run at night and she could not figure out a schedule and the child needed a schedule. Id. at 113.

Mother was asked by her lawyer if it was correct that Grandfather said he did not recall giving the child any kind of foods that upset Mother, she replied, "No," and said it all began on July 4th at the cookout at Grandfather's Id. at 116-117. She thought Grandfather was on marijuana because he kept repeating how happy he was to see the child and to not have to cook. Id. at 118-119. She further testified the child was sitting on paternal aunt's lap and Father picked up a chip off the table and put it in the child's mouth, which Mother did not like and said so to Grandfather. Id. at 120. There was no testimony that paternal aunt or anyone tried to prevent this or that the child coughed or choked on the chip.

Mother testified that Grandfather then put his finger in the child's mouth after Grandfather had been eating watermelon, and mother said she did not want anything in the child's mouth, but Grandfather put his finger in the child's mouth again when he was putting the child in his car seat. Id. at 121-122.

Grandfather denied trying to give the child a chip and said he was holding the child when the child was sucking on his finger, which apparently had watermelon juice on it since Grandfather had been eating watermelon. Id. at 74.

Mother testified that the incident caused a break in her trust of Grandfather but there were no other incidents when Grandfather overrode her decision. Id. at pp. 132-33. Mother complained that Grandfather and Step-Grandmother made the funeral arrangements for Father and had the obituary prepared without asking for her input. Id. at 137.

Statement of Errors Complained of on Appeal.

Mother states the following as allegations of error on appeal:

5

1. The trial court erred in entering an order granting exceptions of F.S. [paternal grandfather] without due regard to the factors set forth in 23 Pa. C. S. A. §5328.

The Summary Opinion dated October 22, 2018 contains a discussion of the findings of the Master and the February 4, 2019 Order contains a discussion of the factors under 23 Pa.C.S.A. §5328(c)(1), pertaining to an award of partial physical custody to a grandparent, as well as a discussion of the factors under §5328(a).

Mother failed to identify any specific factor which was not given due regard, so that this court could be informed as to which factor to address in this 1925(b) opinion. *See* In re A.B., 63 A.3d 345, 350 (Pa.Super. 2013), that the 1925(b) statement of errors, "must be specific enough for the trial court to identify and address the issue an appellant wishes to raise on appeal," and if a court has to guess what it is the appellant is appealing, "that is not enough for meaningful review." [Citations omitted].

2. The trial court failed to consider whether an award of the partial custody or visitation rights of grandfather would be in the best interest of the minor child.

In the October 22, 2018 Summary Opinion this court discussed the best interest of the child:

> Most significantly, Paternal Grandfather is the closest link to his father that the child can hold onto. The child should not be deprived of this because Mother disapproved of how Grandfather was interacting with the child on one occasion. And it cannot be said that Mother will involve Grandfather in the child's life in the future, based upon the lack of contact with Grandfather since July, 2017. Thus, it is in the best interest of the child to maintain a relationship with Paternal Grandfather.
>
> Moreover, Mother's parents are deceased so that Grandfather and Paternal Grandmother are the child's only grandparents. The fact that Paternal Grandmother was reportedly not told about the child's birth until some five days later does not lead one to believe her involvement with the child will be substantial. Absent egregious circumstances, which are not present here, a child should not be deprived of the unconditional love and devotion that only a grandparent can bestow.

In the February 4, 2019 Order and Opinion, this court examined the child's contact with Grandfather and the best interest of the child as required by Section 5328(c)(1)(i) and (iii), respectively, as follows:

> The child was only nine and ½ months old when Grandfather filed his Complaint for Partial Custody, and, tragically, the child's Father, Grandfather's son, Jacob Snyder, had passed away on May 9, 2017, when the child was less than four months old. Grandfather visited at the hospital right after the child was born, helped Mother and Father paint the nursery, watched the child when Mother went to the hospital to see Father on an almost daily basis. Notes of Testimony, May 22, 2018, at 28, 40 and 50. Thereafter Grandfather saw the child on a regular basis in addition to every Wednesday and Saturday when Mother went running and once Mother returned to work, he and Step-Grandmother Myrna Butkovitz provided child care two days per week. N.T. at 187, 189.
>
> . . .
>
> Since Paternal Grandfather is the only grandparent who was involved in the child's life after his birth, with Paternal Grandmother's involvement being very little, and since Maternal Grandparents are deceased, it is concluded that it serves the best interest of the child to have a loving grandparent involved in the child's life; otherwise, the child would be deprived of the emotional benefits provided by this familial relationship.

3.  <u>The trial court failed to consider whether the partial custody or visitation rights for the paternal grandfather, F.S., would interfere with the parent-child relationship.</u>

The November 4th order/opinion states the following findings under subsection (ii) of Section 5328(c)(1):

> Grandfather primarily sought periods of custody with the child during the time the child was in childcare, when Mother was at work *so as not to take away from her custody time with the child* and the order as set forth above follows that guideline. There are very limited periods of custody awarded to Grandfather when the child would otherwise be in Mother's custody. (Emphasis added).

7

In addition, the only instance Mother could cite as to when Grandfather did anything against her wishes was the potato chip, watermelon incident on the 4th of July.

As noted by the Superior Court in K.T. v. L.S., 118 A.3d, 1136, 1161 (Pa.Super. 2015), citing Nancy E.M. v. Kenneth D. M., 462 A.2d 1386, 1388 (Pa.Super. 1983), a custodial parent's suspicions of or animosity towards a party seeking partial custody should not in itself warrant denial of same. The appellate court reversed the trial court's denial of partial custody to paternal grandparents notwithstanding the friction between the parties, where father was deceased and where there was no consideration of the important contribution grandparents can make in children's lives. Id. at 1164.

4.      The trial court erred in refusing to permit testimony and witnesses offered by Mother which would be relevant to a custody order considering the welfare and best interest of the child.

In ruling on Exceptions, the trial court makes an independent review of the record to determine "whether the hearing officer's findings and recommendations are appropriate." T.B. v. L.R.M., 753 A. 2d 873, 881 (Pa.Super. 2000). As required by Rule 1915.4-2, Pa.R.C.P., "If exceptions are filed, the court shall hear argument on the exceptions ... and enter an appropriate final order within fifteen days of argument."

Thus, the court was required to review the transcript for disposition of Grandfather's Exceptions and said transcript showed that the only witness "offered" by Mother, i.e., that she stated she wanted to call, was Megan, Grandfather's daughter, who was a part-time caregiver. N.T., 5/22/18 at 255-56. When counsel voiced her concern to the Master that he would not take testimony from the witness, the Master stated he cut two witnesses because he believed it would be cumulative. The transcript shows there was no response to this decision of the Master advising what, if any, testimony not already presented would be made by the witness, such that his conclusion testimony would be cumulative was error. Id. at 255-56.

8

At the Exceptions hearing before this court, counsel argued that she was denied the right to present Megan Snyder, "who could add more into the – what was going on here;" then, she "would have offered testimony contra—but we were denied that." Notes of Testimony, October 9, 2018, p. 37.

Pennsylvania Rule of Evidence 403, provides that the court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: … needlessly presenting cumulative evidence." The transcript shows the Master concluded that the witness testimony Mother's attorney sought to introduce would be cumulative and there was nothing said by counsel to challenge or otherwise show the conclusion was an error. N.T. 5/22/18, p. 256. Nor did anything that was argued before this court at the hearing on Exceptions show that the Master' decision was an error.

Mother's own testimony established that she lost trust in Grandfather due to the July 4th incident and there was nothing else she could identify in addition to that incident. She also testified that the witness Megan was present and counsel made no offer of proof, nor cross-examined Grandfather, as to whether the witness saw or heard something not heard or observed by Mother. Mother's own attorney even conceded that "[m]any of her concerns may have been unsubstantiated," referring to Mother. N.T. 10/9/18, p. 38.

Thus, Mother testified as to all the circumstances leading to her mistrust of Grandfather, i.e., the 4th of July incident, and testimony from a witness about "what was going on here," i.e., presumably what was going on between the parties, would not even be admissible, aside from being cumulative, if the witness was not called to testify as to what she had seen or heard.

5.  The trial court erred in relying upon the notes of testimony from the custody master who limited the number of witnesses that could be present at the custody master's hearing.

This matter was addressed in No. 4 above.

6. The Trial Court erred by entering an order that is excessive and burdensome so as to interfere with the Parent Child relationship.

Mother testified that the child arrives at daycare at 6:30 a.m., is home at 3:15 p.m. and in bed at 6:30 p.m., and on weekends, when they have time together, they see friends and family. N.T., 5/22/18, p. 131. Since the custody schedule is that Grandfather has custody only on Wednesday from 10:00 a.m. (to avoid traveling to the facility during morning rush hour traffic) to 7:00 p.m. and the first Friday of the month (when Wednesday custody time would be eliminated), from 10:00 a.m. Friday to 3:00 p.m. Saturday, Mother's time with the child is cut back by only four hours for each of three or four weeks each month, and one period of twelve hours, inclusive of sleep time each month.

Hence, it cannot be concluded that the above described custody schedule is either excessive or burdensome, particularly since Grandfather provides all the transportation and nothing is required of Mother.

7. The trial court erred in failing to consider and conduct a detailed analysis of the Custody Act's factors relating to grandparents as required by 23 Pa. C.S.A. §5328.

The factors under 23 Pa.C.S.A. §5328(c)(1) were discussed in the February 4, 2019 Order and Summary Opinion. Moreover, since the child was only nine months old when Grandfather filed his Complaint for Partial Custody, and there was no real interaction between the parties after the child was approximately five months old, there are limited facts which can be discussed, particularly when Mother herself testified that it was the July 4th incident which caused the disruption between the two parties, as opposed to anything else or any accumulation of incidents. Thus, it is not possible to produce volumes of discussion when the underlying facts are very limited.

10

In addition, Mother does not cite to any evidence which was not addressed in the February Summary Opinion, nor does she cite specific fact or incident which was overlooked.

8.     The Trial Court erred in failing to elicit and provide the Mother the opportunity to present testimony and witnesses as to Grandfather's inability to care for the child.

At the Exceptions hearing before this court, Grandfather appeared in court in a wheelchair and explained that he was on a tour boat that hit a wave and he was knocked to the deck and broke his leg. He expected to see the surgeon in two days, and was looking at about three to four weeks recovery, with non-weight bearing instructions. N.T., 10/9/18, p. 4.

Grandfather lives with Step-Grandmother who, presumably would be transporting and caring for the child in any capacity where Grandfather was unable to do so while recovering from the fall.

Moreover, Mother testified that Grandfather had previously sustained an injury – a broken back according to Mother – and was in a brace until May, 2017. N.T., 5/22/18, p. 134. This broken back condition of Grandfather apparently did not render him incapable of caring for the child when childcare was needed from after the child's birth until July 4, 2017.

In addition, the matter under review is the decision of this court as to whether Grandfather's Exceptions should have been granted and whether the custody order proposed by the master was appropriate, based upon the evidence from the hearing before the Master and or whether it was otherwise an abuse of discretion or an error. Grandfather's physical condition at the Exceptions hearing was not part of the evidence to be considered by the court in ruling on the Exceptions absent a specific representation, request or pleading to supplement the hearing before the Master to consider subsequent matters which might have impacted upon the custody decision.

No such representation, request or pleading was made at the time of the hearing or prior to the February 4, 2019 order.

11

9. <u>The Trial Court erred by failing to determine the credibility of the witnesses.</u>

When there is a proceeding before a hearing officer, the trial court makes an independent review of the record to determine "whether the hearing officer's findings and recommendations are appropriate" and the trial court is not empowered to second-guess on the issue of credibility. <u>T.B. v. L.R.M.</u>, 753 A. 2d 873, 881 (Pa.Super. 2000).

With regard to whether the credibility of witnesses was called into question before the Master, in his Report he found that many of Mother's concerns were unsubstantiated but there was evidence showing some of her concerns were legitimate, i.e., the daycare issue.

During testimony, the Master interjected, "Counsel, are we really making that big of a deal about watermelon and potato chips?" and he noted that nothing horrible happened with the potato chip. <u>Id</u>. at 122, 124. The Master further stated that he thinks Mother is afraid of Grandfather asserting himself more than he should but he (the Master) wanted to know more about what her concerns were that Grandfather was trying to override her preferences to which she had no response. <u>Id.</u> at 122, 125.

Thus, the Master made remarks and/or observations which might be construed as commenting on credibility, but his remarks were not called into question by either Grandfather or this court. The Summary Opinion of this court, from the middle of page 3 to the end, discusses why this court found that the Master's concerns about Grandfather were not sufficient to deny Grandfather's request for partial physical custody but this did not implicate any issue of credibility of witnesses.

10. <u>The Trial Court deprived Mother of her due process rights by denying her the opportunity to provide evidence and witnesses to show why Grandfather's request for custodial rights were not in the best interest of the child.</u>

This issue was discussed in Nos. 4 and 8 above.

12

11. **The Trial Court erred by awarding Grandfather custodial rights during Mother's observance of the Jewish Sabbath and on holidays which Mother and child do not observe and by assuming without testimony that it will not interfere with the child's religious practices set by Mother.**

The February 4th order provides for Grandfather to have a period of custody with the child from 6:00 p.m. Christmas Eve to 6:00 p.m. Christmas day, noting that Christmas is a secular holiday as much as a religious holiday such that it would not interfere with religious practices set by Mother.

In addition, paragraph 8 of the order specifically provides that if a Jewish holiday, which Mother observes, falls on one of Grandfather's periods of custody, Grandfather shall have his scheduled period of custody on another day.

With regard to observance of the Sabbath, Mother presented no testimony before the Master on this issue, which is the only permissible record under consideration by this court for review of Exceptions and the proposed order of the Master. Moreover, it is not clear as to what religious practices can be assigned to the child at his tender age and can be an appropriate matter for modification in the future.

12. **The Trial Court erred by not specifically determining the contribution that Grandfather should make to the child's daycare and further inquiring as to Mother's representations of the daycare's financial requirements.**

Mother's proposed custody order included a provision that stated, "Insofar as the child's day care must be paid solely on a weekly basis without exception, and the child must attend fulltime to remain registered at the daycare of Mother's choice, Grandfather shall reimburse Mother $139.20 per week for the two days that Jackson will miss when he spends his time with Grandfather." *See* Proposed Order submitted by Mother on November 16, 2018, paragraph No. 8.

13

The fact that Mother proposed periods of custody for Grandfather during childcare times, as long as Grandfather paid for childcare, as opposed to supervised partial physical custody, undermines Mother's claim that her trust in Grandfather is broken and she does not trust that he will not undermine what she wants for the child.

The February 4, 2019 Order does have a provision suggesting that Grandfather consider making some contribution to childcare costs since the child's presence at the daycare center provides for a workable custody exchange arrangement. Counsel cites no authority for compelling a grandparent to contribute to the support of a grandchild.

13. The Trial Court erred by awarding holiday and vacation times to Grandfather for the next sixteen years without taking into consideration and accepting testimony as to whether such an award will interfere with the Parent/child relationship and whether such an award is in the best interests of the child.

There is no provision of the order of the court, nor statutory or procedural authority, that precludes modification of the custody order of February 4, 2019, in any appropriate fashion after disposition of the appeal.

14. The Trial Court erred by basing its Order/Opinion on facts that were contested and/or not in evidence.

This allegation of error cites no specifics as to what "contested facts" or facts not in evidence were referenced or cited by this court either in the October Summary Opinion or final order entered February 2019 in connection with the conclusion that, under the facts as presented in this case, the law of Pennsylvania does support denying partial custody rights to Grandfather.

The October Summary Opinion states on page 1, that, "The primary concern cited by the master was that Paternal Grandfather has the opinion the child should be pulled from daycare over Mother's objection so that Grandfather could provide childcare."

14

Specifically, the Master wrote in his report: "There was evidence that awarding PGF custody may affect the mother-child relationship. It is of concern that the PFG [sic] thought he knew best in deciding the child should be pulled from daycare over mother's objection. However, PGF did scale this back."

As was discussed above, what Grandfather said was he believed the child would be better off with him two days a week but he would defer to Mother's judgment. In addition, Grandfather's attorney pointed out in her opening statement that exercising partial custody while Mother was at work would not·detract from her time with the child. Id. at 101, 6.

This court concluded that the testimony did not support the Master's conclusion about Grandfather's testimony since it did not so much "articulate an assertion that he knows better than Mother about caring for the child, as opposed to a natural reaction that it would be better for a seven-month child to be with a relative a couple days out of the week rather than in fulltime daycare where the child would not have the benefit of more consistent nurturing and care with less exposure to germs, etc., which are the disadvantages of day care at an early age." Summary Opinion, p. 2.

This court then concluded that the findings of the Master were not sufficient to deny Grandfather's request for partial physical custody particularly under the standards set by Section 5325(1), where Father is deceased, in light of the contact between Grandfather and child during this child's first few months after birth and taking into consideration the best interest of the child.

15.    The Trial Court erred by failing to conduct a trial de novo to determine the best interests of the child in the custody dispute between Grandfather and Mother.

Rule 1915.4-2(b)(3) and (6) of Pennsylvania Rules of Civil Procedure, which governs custody hearing procedures where counties conduct record hearings with a hearing officer,

15

specifies that if exceptions are filed to the report of the hearing officer, the court shall hear argument and enter a final order within fifteen days. The Rule makes no provision for a trial de novo, unlike Rule 1915.4-1, which controls in counties where no record hearings are conducted. As provided in Rule 1915.4-1(b), parties may move the court for a hearing before a judge after the initial in-person contact with the court.

Presumably, nothing in the rule would preclude an order for a de novo hearing as part of the final order on exceptions. However, in this case, the only arguable grounds for a de novo hearing would be to hear from witnesses disallowed by the Master, as raised by Mother's attorney during argument on the Exceptions, specifically Megan, Grandfather's daughter. N.T., 10/9/18, p. 37. The Master concluded the testimony would be cumulative, which was not challenged by counsel on the record to show whether or why said testimony would not be cumulative. Hence, there were no grounds upon which to consider, let alone order a trial de novo.

16. The Trial Court erred in failing to further inquire into Grandfather's health and compel him to produce medical evidence of his ability to care for and transport the child who is two years old.

As set forth above, Grandfather appeared for the October 9, 2018 hearing in a wheelchair and explained that he was on a tour boat when it hit a massive wave and he was knocked down and broke his leg, he sees a surgeon in two days and anticipates three to four weeks for recovery. And his current situation was non-weight-bearing.

Furthermore he lives with his wife, who was pushing the wheel chair. Thus, there is an able-bodied person in the house to care for the child until Grandfather can do so.

17. The Trial Court erred in failing to consider the child's safety in a home where Grandfather has suffered a significant injury.

See No. 16 above.

Additional Discussion

The facts of this case are particularly poignant considering that Mother lost her husband and Grandfather lost his son four months after the child was born. Both parties would have been dealing with a tragic loss as well as the confounding joy of the birth of the child, and the challenge of reconciling such conflicting emotions.

It must be noted that, particularly since there are no maternal grandparents, this child has what many, many children do not have – a loving grandparent who is capable of, and wants to be part of the child's life and even provide childcare when needed by Mother. To deny Grandfather contact with the child and to deny the child the love of a grandfather because Mother "lost trust" in Grandfather after the incident on the 4th of July or because Grandfather expressed an opinion that the six-month-old child would be better with Grandfather for two days out of the week rather than in full time daycare, is both unreasonable and contrary to Pennsylvania law.

As stated in K.T. v. L.S., Pennsylvania has a strong public policy "favoring grandparent involvement in a child's life." Id. at 1164 (citations omitted). In that case, the acrimony between grandparents and mother was much more pronounced than in the instant matter. Mother thought the grandparents were horrible people, she threw away the candy and toys grandparents gave to the children because candy is bad for children and the toys they had promoted violence, and she complained the children were having nightmares after initial periods of partial custody, while grandmother filed to prevent the adoption of the children by mother's husband whom grandmother said was a racist and had facebook postings related to "Nazi stuff". Id. at 1142, 1146-1147.

17

In reversing the trial court's decision to deny the petition of the grandparents, the Superior Court discussed how custodial parent's animosity towards another parent or third party seeking partial custody should not itself warrant denial, otherwise, the custodial parent could always effectively deny partial custody to everyone by claiming animosity. Id., at 1161, quoting Commonwealth ex rel. Williams v. Miller, 385 A.2d 992, 995 (Pa.Super. 1978). The opinion and conclusion of the appellate court present a compelling standard for implementing Pennsylvania's statutory requirements governing the custody rights of grandparents, particularly where the parent is deceased.

Conclusion

The evidence presented to the custody master supports the conclusion of this court that Paternal Grandfather is entitled to an award of partial physical custody of his grandchild, notwithstanding Mother's objection, and that it would be in the best interest of the child. Hence, the record supports affirmance of the trial court's decision.

BY THE COURT:

DATE: March 20, 2019

DORIS A. PECHKUROW, S.J.

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

MAR 2 0 2019

FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

18



IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FAMILY COURT DIVISION

BROOKE FREEZMAN
PETITIONER

VS.

FREDRICK SNYDER
RESPONDENT

CASE ID. 0C1701579

## ORDER

AND NOW, THIS **4TH** DAY OF **FEBRUARY** , **2019**, IT IS HEREBY ORDERED AS FOLLOWS:

1.    MOTHER BROOKE FREEZMAN SHALL RETAIN PRIMARY PHYSICAL AND SOLE LEGAL CUSTODY OF THE CHILD JACKSON SNYDER, BORN JANUARY 27, 2017.

2.    EFFECTIVE FEBRUARY 20, 2019, PATERNAL GRANDFATHER FREDERICK SNYDER SHALL HAVE PARTIAL PHYSICAL CUSTODY EVERY WEDNESDAY FROM 10:00 A.M. TO 7:00 P.M.   GRANDFATHER TO PROVIDE TRANSPORTATION FROM DAYCARE IN THE MORNING TO MOTHER'S RESIDENCE IN THE EVENING.   THE EXTENDED TIME IN THE EVENING WILL PROVIDE SOME FREE TIME TO MOTHER FOR CHORES OR APPOINTMENTS AND WEDNESDAY WAS SELECTED SO AS NOT TO INTERFERE WITH MOTHER'S ABILITY TO MAKE WEEKEND PLANS AND TO PROVIDE A MID-WEEK BREAK FOR THE CHILD FROM DAYCARE.

3.    EFFECTIVE MARCH 1, 2019, GRANDFATHER SHALL HAVE CUSTODY ON THE FIRST FRIDAY OF EACH MONTH INSTEAD OF THE PRECEDING WEDNESDAY, FROM 10:00 A.M. FRIDAY TO 3:00 P.M. SATURDAY.   AGAIN, THE EXTENDED TIME TO SATURDAY AFTERNOON WILL PROVIDE FREE TIME FOR MOTHER FOR CHORES OR APPOINTMENTS.

4.    IF THE DAYCARE WILL BE CLOSED ON ANY ONE OF GRANDFATHER'S SCHEDULED CUSTODY DAYS, AND IF IT IS A HOLIDAY WHERE MOTHER WILL BE AT WORK AND IN NEED OF CHILDCARE, THEN GRANDFATHER SHALL HAVE CUSTODY FROM 7:00 P.M. THE EVENING BEFORE TO THE REGULARLY SCHEDULED CUSTODY RETURN TIME FOR THAT DAY.

5.    GRANDFATHER SHOULD CONSIDER MAKING SOME CONTRIBUTION TO THE CHILD'S DAYCARE COSTS FOR THE DAYS HE HAS CUSTODY SINCE THE DAYCARE

OR622 \\ REV 9/05
JN482073

Page 1 of 6



PROVIDES A WORKABLE CUSTODY EXCHANGE ARRANGEMENT. IT IS UNKNOWN WHETHER MOTHER'S REPRESENTATIONS IN HER PROPOSED CUSTODY SCHEDULE ARE ACCURATE THAT THE CHILD MUST REMAIN REGISTERED FULLTIME AT THE DAYCARE BUT MOTHER IS ENTITLED TO ENROLL THE CHILD IN A FACILITY SHE DEEMS APPROPRIATE.

6. GRANDFATHER SHALL HAVE CUSTODY ON FATHER'S DAY FROM 10:00 A.M. TO 5:00 P.M. GRANDFATHER TO PROVIDE TRANSPORTATION FROM AND TO MOTHER'S RESIDENCE.

7. AT CHRISTMAS, GRANDFATHER SHALL HAVE CUSTODY FROM 6:00 P.M. CHRISTMAS EVE TO 6:00 P.M. CHRISTMAS DAY. SINCE CHRISTMAS IS A SECULAR AS WELL AS A RELIGIOUS HOLIDAY, THE CELEBRATION WITH GRANDFATHER WILL NOT INTERFERE WITH THE CHILD'S RELIGIOUS PRACTICES SET BY MOTHER.

8. IF A JEWISH HOLIDAY WHICH MOTHER OBSERVES FALLS ON ONE OF GRANDFATHER'S SCHEDULED CUSTODY DAYS SUCH THAT IT WOULD INTERFERE WITH MOTHER'S PLANNED OBSERVANCE, THEN GRANDFATHER SHALL HAVE HIS PERIOD OF SCHEDULED PARTIAL PHYSICAL CUSTODY ON ANOTHER DAY THAT SAME WEEK.

9. FOR THANKSGIVING, GRANDFATHER SHALL HAVE CUSTODY ON FRIDAY AFTER THANKSGIVING, INSTEAD OF WEDNESDAY BEFORE THANKSGIVING, FROM 10:00 A.M. TO 7:00 P.M.

10. FOR THE SUMMER OF 2019, GRANDFATHER SHALL HAVE ONE EXTENDED FIRST FRIDAY PERIOD OF CUSTODY WITH THE CHILD UNTIL 6:00 P.M. SUNDAY, AND ONE EXTENDED WEDNESDAY PERIOD OF CUSTODY UNTIL 6:00 P.M. SATURDAY, WITH SIXTY (60) DAYS NOTICE TO MOTHER AS TO THE SPECIFIC DATES. THE PARTIES MUST ARRANGE FOR FACE-TIME CONTACT BETWEEN MOTHER AND THE CHILD ON EACH EVENING.

11. FOR THE SUMMERS OF 2020 AND 2021, GRANDFATHER SHALL HAVE ONE FIVE-DAY PERIOD OF VACATION WITH THE CHILD, FROM 6:00 P.M. SUNDAY UNTIL 6:00 P.M. FRIDAY, PLUS ONE EXTENDED FIRST FRIDAY PERIOD AS DESCRIBED ABOVE, WITH SIXTY (60) DAYS NOTICE TO MOTHER AS TO THE SPECIFIC DATES. THE PROVISION CONCERNING DAILY EVENING CONTACT BETWEEN THE CHILD AND MOTHER APPLIES.

12. BEGINNING IN THE SUMMER OF 2022, GRANDFATHER SHALL HAVE ONE WEEK OF VACATION WITH THE CHILD FROM 6:00 P.M. FRIDAY TO THE FOLLOWING FRIDAY AT 6:00 P.M., IN ADDITION TO ONE EXTENDED FIRST FRIDAY AS DESCRIBED ABOVE, WITH SIXTY (60) DAYS NOTICE TO MOTHER AS TO THE SPECIFIC DATES.

13. DURING GRANDFATHER'S EXTENDED PERIODS OF TIME WITH THE CHILD, HE MAY NOT TRAVEL BEYOND PENNSYLVANIA, NEW JERSEY OR DELAWARE WITH THE CHILD AND MUST PROVIDE SPECIFIC, DETAILED INFORMATION AS TO LOCATION AND CONTACT INFORMATION WELL IN ADVANCE.

14. IF SOME COMPELLING INCIDENT ARISES THAT WOULD INTERFERE WITH GRANDFATHER'S SCHEDULED CUSTODY TIME WITH THE CHILD HE MUST NOTIFY MOTHER IMMEDIATELY AND HE WILL NOT BE ENTITLED TO SUBSTITUTE TIME.

OR622 II REV 9/05
JN482073

15. MOTHER SHALL PROVIDE THIRTY (30) DAYS NOTICE WHEN POSSIBLE OF TRAVEL OR OTHER PLANS THAT WOULD INTERFERE WITH FATHER'S SCHEDULED PERIODS OF CUSTODY. HE SHALL BE ENTITLED TO ALTERNATE TIME IF IT INTERFERES WITH HIS EXTENDED DAYS IN THE SUMMER.

16. IF SHE HAS NOT ALREADY DONE SO, MOTHER SHALL PROVIDE TO GRANDFATHER INFORMATION ABOUT THE CHILD'S DIET AND SCHEDULE SO THAT GRANDFATHER SHALL FOLLOW SAME.

17. THE PARTIES SHALL REFRAIN FROM CRITICIZING ONE ANOTHER IN THE PRESENCE OF THE CHILD.

18. GRANDFATHER'S OBJECTION TO MOTHER'S NOTICE OF RELOCATION IS OVERRULED WITHOUT A HEARING.

THE PARTIES APPEARED FOR A CONFERENCE BEFORE THE MASTER, AS THE INITIAL STEP FOR THE RELOCATION PROCEDURE, AND THE MASTER DECLINED TO SCHEDULE A HEARING. ALTHOUGH IT IS UNKNOWN WHY ASSERTIONS IN MOTHER'S PROPOSED CUSTODY SCHEDULE STATE THAT HER RELOCATION TO 507 W. GLENSIDE AVENUE, GLENSIDE, PA IS ONLY 12.8 MILES FROM HER PRESENT LOCATION OF 2424 S. 9TH STREET, WHEN GOOGLE DIRECTIONS SHOW IT IS 19.5 MILES AND AN AVERAGE OF ONE HOUR OR MORE DRIVING TIME, AND SHE DID NOT CONSIDER THE ADDITIONAL TRAVEL TIME IN HER PROPOSED CUSTODY SCHEDULE FOR GRANDFATHER, NONETHELESS HER RELOCATION DOES NOT SIGNIFICANTLY IMPAIR GRANDFATHER'S ABILITY TO EXERCISE CUSTODIAL RIGHTS AS SET FORTH ABOVE BY THIS COURT. HENCE, THE RELOCATION REQUIREMENTS OF 23 PA.C.S.A. SECTION 5337 ARE NOT APPLICABLE.

NOTICE OF INTENT TO RELOCATE: NO PARTY MAY MAKE A CHANGE IN THE RESIDENCE OF ANY CHILD WHICH SIGNIFICANTLY IMPAIRS THE ABILITY OF THE OTHER PARTY TO EXERCISE CUSTODIAL RIGHTS WITHOUT FIRST COMPLYING WITH ALL THE APPLICABLE PROVISIONS OF 23 PA.C.S. SECTION 5337 AND PA.R.C.P. NO. 1915.17 REGARDING RELOCATION.

SUMMARY OPINION
DISCUSSION OF FACTORS IN SUPPORT OF CUSTODY ORDER

THE SUMMARY OPINION OF THIS COURT DATED OCTOBER 22, 2018 IS HEREBY INCORPORATED BY REFERENCE AS A FACTUAL BACKGROUND IN SUPPORT OF THE CUSTODY ORDER OF FEBRUARY 4, 2019.

FACTORS UNDER 23 PA.C.S.A. SECTION 5328(C)(1)

PATERNAL GRANDFATHER HAS STANDING FOR PARTIAL PHYSICAL OR SUPERVISED PHYSICAL CUSTODY OF THE CHILD UNDER 23 PA.C.S.A. SECTION 5325 (1) AS GRANDFATHER OF THE CHILD'S DECEASED FATHER.

THE FACTORS WHICH MUST BE CONSIDERED FOR AN AWARD OF PARTIAL OR SUPERVISED PHYSICAL CUSTODY TO A GRANDPARENT OR GREAT-GRANDPARENT UNDER 23 PA.C.S.A. SECTION 5328(C)(1) ARE:

(I) THE AMOUNT OF PERSONAL CONTACT BETWEEN THE CHILD AND THE PARTY PRIOR TO THE FILING OF THE ACTION:

THE CHILD WAS ONLY NINE AND 1/2 MONTHS OLD WHEN GRANDFATHER FILED HIS COMPLAINT FOR PARTIAL CUSTODY, AND, TRAGICALLY, THE CHILD'S FATHER, GRANDFATHER'S SON, JACOB SNYDER, HAD PASSED AWAY ON MAY 9, 2017, WHEN THE CHILD WAS LESS THAN FOUR MONTHS OLD. GRANDFATHER VISITED AT THE HOSPITAL RIGHT AFTER THE CHILD WAS BORN, HELPED MOTHER AND FATHER PAINT THE NURSERY, WATCHED THE CHILD WHEN MOTHER WENT TO THE HOSPITAL TO SEE FATHER ON AN ALMOST DAILY BASIS. NOTES OF TESTIMONY, MAY 22, 2018, AT 28, 40 AND 50. THEREAFTER GRANDFATHER SAW THE CHILD ON A REGULAR BASIS IN ADDITION TO EVERY WEDNESDAY AND SATURDAY WHEN MOTHER WENT RUNNING AND ONCE MOTHER RETURNED TO WORK, HE AND STEP-GRANDMOTHER MYRNA BUTKOVITZ PROVIDED CHILD CARE TWO DAYS PER WEEK. N.T. AT 187, 189.

(II) WHETHER THE AWARD INTERFERES WITH ANY PARENT-CHILD RELATIONSHIP:

GRANDFATHER PRIMARILY SOUGHT PERIODS OF CUSTODY WITH THE CHILD DURING THE TIME THE CHILD WAS IN CHILDCARE, WHEN MOTHER WAS AT WORK SO AS NOT TO TAKE AWAY FROM HER CUSTODY TIME WITH THE CHILD AND THE ORDER AS SET FORTH ABOVE FOLLOWS THAT GUIDELINE. THERE ARE VERY LIMITED PERIODS OF CUSTODY AWARDED TO GRANDFATHER WHEN THE CHILD WOULD OTHERWISE BE IN MOTHER'S CUSTODY.

(III) WHETHER THE AWARD IN IN THE BEST INTEREST OF THE CHILD:

SINCE PATERNAL GRANDFATHER IS THE ONLY GRANDPARENT WHO WAS INVOLVED IN THE CHILD'S LIFE AFTER HIS BIRTH, WITH PATERNAL GRANDMOTHER'S INVOLVEMENT BEING VERY LITTLE, AND SINCE MATERNAL GRANDPARENTS ARE DECEASED, IT IS CONCLUDED THAT IT SERVES THE BEST INTEREST OF THE CHILD TO HAVE A LOVING GRANDPARENT INVOLVED IN THE CHILD'S LIFE, OTHERWISE, THE CHILD WOULD BE DEPRIVED OF THE EMOTIONAL BENEFITS PROVIDED BY THIS FAMILIAL RELATIONSHIP.

FACTORS UNDER 23 PA.C.S.A. SECTION 5328

(1) WHICH PARTY IS MORE LIKELY TO ENCOURAGE AND PERMIT FREQUENT AND CONTINUING CONTACT BETWEEN THE CHILD AND ANOTHER PARTY.

GRANDFATHER HAS VERBALIZED AND DEMONSTRATED THAT THE CUSTODY TIME HE IS REQUESTING WITH THE CHILD SHOULD NOT TAKE AWAY FROM MOTHER'S TIME WITH THE CHILD OR SHOULD DO SO AT A MINIMUM. ON THE OTHER HAND, MOTHER HAS OPPOSED CUSTODY TIME FOR GRANDFATHER AND IS LIKELY TO CONTINUE TO DO SO IN THE FUTURE.

(2) THE PRESENT AND PAST ABUSE COMMITTED BY A PARTY OR MEMBER OF THE PARTY'S HOUSEHOLD, AND WHETHER THERE IS A CONTINUED RISK OF HARMTO THE CHILD OR AN ABUSED PARTY AND WHICH PARTY CAN BETTER PROVIDE ADEQUATE PHYSICAL SAFEGUARDS AND SUPERVISION OF THE CHILD.

THERE IS NO EVIDENCE OR ALLEGATION OF ABUSE.

OR622 \\ REV 9/05
JN482073

(2.1) THE INFORMATION SET FORTH IN SECTION 5329.1(A)(RELATING TO CONSIDERATION OF CHILD ABUSE AND INVOLVEMENT WITH PROTECTIVE SERVICES).

THERE HAS BEEN NO INVOLVEMENT OF CHILD PROTECTIVE SERVICES.

(3)    THE PARENTAL DUTIES PERFORMED BY EACH PARTY ON BEHALF OF THE CHILD.

THERE IS NO QUESTION THAT MOTHER IS THE SOLE PARENT OF THE CHILD AND HAS SINGULARLY PERFORMED THE PARENTAL DUTIES PROVIDED TO THIS CHILD.  GRANDFATHER PROVIDED THE NECESSARY CHILDCARE WHEN NEEDED BY MOTHER ON NUMEROUS OCCASIONS PRIOR TO JULY 4, 2017.

(4)    THE NEED FOR STABILITY AND CONTINUITY IN THE CHILD'S EDUCATION, FAMILY LIFE AND COMMUNITY LIFE.

NOTHING ABOUT THE PARTIAL CUSTODY SCHEDULE FOR GRANDFATHER INTERFERES WITH THE CHILD'S STABILITY OR CONTINUITY WITH EDUCATION OR COMMUNITY LIFE SINCE THE CHILD IS ONLY TWO YEARS OLD AND HIS EDUCATION/COMMUNITY INVOLVEMENT IS ATTENDANCE AT CHILDCARE WHILE MOTHER IS AT WORK.

(5)    THE AVAILABILITY OF EXTENDED FAMILY.

PATERNAL GRANDFATHER IS ONE OF ONLY A VERY FEW EXTENDED FAMILY MEMBERS.

(6)    THE CHILD'S SIBLING RELATIONSHIPS.

THIS FACTOR DOES NOT APPLY AS THERE ARE NO SIBLINGS.

(7)    THE WELL-REASONED PREFERENCE OF THE CHILD, BASED ON THE CHILD'S MATURITY AND JUDGMENT.

THIS FACTOR DOES NOT APPLY SINCE THE CHILD IS ONLY TWO YEARS OLD.

(8)    THE ATTEMPTS OF A PARENT TO TURN THE CHILD AGAINST THE OTHER PARENT, EXCEPT IN CASES OF DOMESTIC VIOLENCE WHERE REASONABLE SAFETY MEASURES ARE NECESSARY TO PROTECT THE CHILD FROM HARM.

THERE IS NO EVIDENCE THAT EITHER PARTY HAS ATTEMPTED TO INFLUENCE THE CHILD AGAINST THE OTHER PARTY.

(9)    WHICH PARTY IS MORE LIKELY TO MAINTAIN A LOVING, STABLE, CONSISTENT AND NURTURING RELATIONSHIP WITH THE CHILD ADEQUATE FOR THE CHILD'S EMOTIONAL NEEDS.

NO CHALLENGE HAS BEEN RAISED TO MOTHER'S ABILITY TO MAINTAIN A LOVING, STABLE, CONSISTENT AND NURTURING RELATIONSHIP WITH THE CHILD. GRANDFATHER SEEKS ONLY TO ADD TO A LOVING, NURTURING ENVIRONMENT FOR THE CHILD AS A GRANDPARENT AND NOT A SUBSTITUTE PARENT.

(10) WHICH PARTY IS MORE LIKELY TO ATTEND TO THE DAILY PHYSICAL, EMOTIONAL, DEVELOPMENTAL, EDUCATIONAL AND SPECIAL NEEDS OF THE CHILD.

NO CHALLENGE HAS BEEN RAISED TO MOTHER'S ABILITY TO MAINTAIN A LOVING, STABLE, CONSISTENT AND NURTURING RELATIONSHIP WITH THE CHILD. GRANDFATHER SEEKS ONLY TO ADD TO A LOVING, NURTURING ENVIRONMENT FOR THE CHILD AS A GRANDPARENT AND NOT A SUBSTITUTE PARENT.

(11) THE PROXIMITY OF THE RESIDENCES OF THE PARTIES.

MOTHER HAS GIVEN NOTICE OF RELOCATING TO A NEW RESIDENCE WHICH IS APPROXIMATELY 20 MILES FROM GRANDFATHER AND APPROXIMATELY ONE HOUR IN TRAVEL TIME. WHILE MOTHER'S PRIOR RESIDENCE WAS MORE CONVENIENT FOR GRANDFATHER FOR CUSTODY EXCHANGES, THE DISTANCE DOES NOT IMPOSE SIGNIFICANT PROBLEMS.

(12) EACH PARTY'S AVAILABILITY TO CARE FOR THE CHILD OR ABILITY TO MAKE APPROPRIATE CHILD-CARE ARRANGEMENTS.

MOTHER HAS MADE APPROPRIATE ARRANGEMENT FOR CHILD-CARE AND GRANDFATHER, WHO IS RETIRED, WILL ONLY BE EXERCISING PERIODS OF PARTIAL PHYSICAL CUSTODY WHEN HE IS ABLE TO BE WITH THE CHILD PHYSICALLY.

(13) THE LEVEL OF CONFLICT BETWEEN THE PARTIES AND THE WILLINGNESS AND ABILITY OF THE PARTIES TO COOPERATE WITH ONE ANOTHER.

IT IS MOST UNFORTUNATE THAT CONFLICT HAS ARISEN BETWEEN THE PARTIES STEMMING FROM AN "INCIDENT" ON JULY 4, 2017. THE EVIDENCE CLEARLY SHOWED A CLOSE RELATIONSHIP BETWEEN GRANDFATHER AND MOTHER WHILE FATHER WAS LIVING AND SHORTLY AFTER HIS TRAGIC, UNTIMELY DEATH.

(14) THE HISTORY OF DRUG OR ALCOHOL ABUSE OF A PARTY OR MEMBER OF A PARTY'S HOUSEHOLD.

MOTHER'S CONCERN THAT GRANDFATHER MIGHT HAVE BEEN SMOKING MARIJUANA WAS NOT SUPPORTED BY EVIDENCE.

(15) THE MENTAL AND PHYSICAL CONDITION OF A PARTY OR MEMBER OF A PARTY'S HOUSEHOLD.

THERE WAS NO EVIDENCE CONCERNING THIS FACTOR.

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

FEB 04 2019
FIRST JUDICIAL DISTRICT OF PA
USER I.D.:

BY THE COURT:

HONORABLE DORIS A. PECHKUROW J.

OR622 \\ REV 9/05
JN482073

Circulated 06/06/2019 03:50 PM

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
DOMESTIC RELATIONS DIVISION

FREDRICK SNYDER                    :
    Petitioner                 :
                               :
    VS.                        :
                               :     CUSTODY NO. 0C1701579
BROOKE FREEZEMAN                   :
    Respondent                 :
                               :
                               :

BY:    DORIS A. PECHKUROW, J.

### SUMMARY OPINION

The child Jackson Snyder was born January 27, 2017. Father passed away on May 9, 2017, after suffering from an illness. Paternal Grandfather Fredrick Snyder filed a complaint for custody on November 15, 2017, which was opposed by Mother Brooke Freezman. The custody master issued a proposed order and findings on June 1, 2018, recommending that the Grandfather's complaint for custody be denied and Grandfather filed exceptions on June 25, 2018.

Argument on the exceptions was held on October 9, 2018, and the matter was held under advisement so the court could review the notes of testimony.

The primary concern cited by the master was that Paternal Grandfather has the opinion the child should be pulled from daycare over Mother's objection so that Grandfather could provide childcare.

The custody master rendered an insightful summary noting that Grandfather and his wife were very close to the father and celebrated holidays and birthdays together and that Mother "enjoyed a healthy relationship with the paternal side of the family."

The master further noted that after father died, the dynamics changed insofar as "Mother has become wary of Paternal Grandfather and Myrna [grandfather's wife] asserting themselves." The Master did find, however, that "[m]any of mother's concerns were unsubstantiated," undermining the credibility of Mother's assertions that she only had an "occasional" relationship with Grandfather and was uncomfortable with him.

The court does not find, however, that the evidence shows that grandfather thought he knew best about pulling the child from daycare over mother's objection, which is the basis of the recommendation by the Master.

While Mother testified that fulltime daycare wasn't initially available, she produced no documents in support of same and, without advance notice to Grandfather, apparently enrolled the child in full time daycare right after the 4th of July, as if fulltime daycare just coincidentally then became available.

In other words, the evidence supports the scenario that Mother originally intended to have Grandfather care for the child two days each week, but she enrolled the child in daycare fulltime right after the 4th of July incident. The "incident" was that Grandfather let the child suck on his finger, which apparently had some watermelon juice, and when Grandfather commented on this Mother reacted with disapproval. Mother also claimed that Grandfather put a particle of a potato chip in the child's mouth, which Grandfather denied doing. The child was not noted to have been coughing or otherwise reacting.

This incident was a focal point of much questioning by Mother's attorney, prompting the master to question, "[A]re we really making that big of a deal about watermelon and

2

potato chips?" [N.T., p. 122]. Not to be deterred, counsel continued that line of inquiry with wife, "Well, he put his fingers down the baby's throat?"

Wife testified that Mother was very controlling of the details of care for the child, how to do the diaper, make the bottle a certain way, etc. [N.T., p. 226]. Hence, it would not be unusual for Mother to criticize Grandfather about letting the child suck his finger [wife testified the child was teething at the time – N.T., p. 220] if she didn't approve. Moreover, considering that Mother had just started back to work, she presumably was still dealing with grief from the loss of her husband two months before, and she faced the challenge of raising the child without his father. Thus, she might very well have taken steps to avoid any dealings that would cause her more stress.

The facts show that Grandfather and his wife watched the child when Mother went running on Saturdays and one day during the week, then watched the child two days per week when Mother went back to work in June. Hence, the abrupt change in the child's daycare schedule can be linked to the July 4th incident.

Grandfather's reaction to putting the child in fulltime daycare is not so much an assertion that he knows better than Mother about caring for the child, as opposed to a natural reaction that it would be better for a seven-month child to be with a relative a couple days out of the week rather than in fulltime daycare where the child would not have the benefit of more consistent nurturing and care with less exposure to germs, etc., which are the disadvantages of day care at an early age. Moreover, Grandfather considered the fact that his seeing the child when Mother was at work avoided diminishing Mother's time with the child on weekends. [N.T., p. 6].

This is not an incident, for example, where Mother selected a preschool program for a child at the age of four years, in anticipation of fulltime school, and Grandfather tries to tell

3

her he can provide better care for the child at that age at his home. Those circumstances would exemplify an overreaching by a grandparent over the parental decisions of a parent, but not the instant circumstances.

Thus, the court does not find that the expressed concerns of the Master are sufficient for denial of Grandfather's request for partial physical custody.

Moreover, Section 5328(c)(1) requires that an award of custody to a party under section 5325 (1) or (2), with section 5325 (1) applying to where a parent is deceased, the court shall consider the amount of contact between the child and the party, whether the award interferes with any parent-child relationship and whether the award is in the best interest of the child.

Neither the circumstances surrounding the incident on the 4th of July, nor Grandfather's expressed concern that it would be better for the infant child to be with Grandfather two days out of the week rather than in full time daycare exhibit an interference with the parent-child relationship. The testimony of Grandfather's wife showed awareness of Mother's parenting expectations and respect for same. Thus there are no grounds to believe that in the future Grandfather would do/say negative things about Mother (he has not been said to have done so thus far).

Most significantly, Paternal Grandfather is the closest link to his father that the child can hold onto. The child should not be deprived of this because Mother disapproved of how Grandfather was interacting with the child on one occasion. And it cannot be said that Mother will involve Grandfather in the child's life in the future, based upon the lack of contact with Grandfather since July, 2017. Thus, it is in the best interest of the child to maintain a relationship with Paternal Grandfather.

4

Moreover, Mother's parents are deceased so that Grandfather and Paternal Grandmother are the child's only grandparents. The fact that Paternal Grandmother was reportedly not told about the child's birth until some five days later does not lead one to believe her involvement with the child will be substantial. Absent egregious circumstances, which are not present here, a child should not be deprived of the unconditional love and devotion that only a grandparent can bestow.

BY THE COURT:

DATE: October 22, 2018

_____
DORIS A. PECHKUROW, J.

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

OCT 22 2018

5